UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SENTINEL INSURANCE COMPANY, LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:18-cv-00016-SEB-MJD |
| DURHAM ENGINEERING, INC., et al. | ) ) ) | |
| Defendants. | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This is a declaratory judgment action wherein Plaintiff Sentinel Insurance Company, Ltd. ("Sentinel") seeks a declaration that it owes no defense or indemnity to Defendant Durham Engineering ("Durham") in connection with a lawsuit filed against Durham and other entities by Defendant Paul Buck, individually and as the Administrator of the Estate of Jill Buck and as parent and guardian of his two minor children, B.B. and A.B. Plaintiff's Motion for Summary Judgment [Dkt. 67] was filed on December 5, 2018, to which Mr. Buck responded but Durham did not. For the reasons detailed in this entry, we <u>GRANT</u> Plaintiff's motion for summary judgment.

**Factual Background**

**The Applicable Consulting Contracts**

On January 29, 2015, the Indiana Department of Transportation ("INDOT") entered into Consulting Contract EDS #A249-15-P141003 ("the Prime Contract") with Parsons Transportation Group, Inc. ("Parsons") for construction inspection services in

1

connection with an Added Travel Lanes Project, Contract Number R-37115-A, on Interstate 65 in Tippecanoe County, Indiana ("the Project"). Parsons, in turn, entered into a Subconsultant Professional Services Agreement ("the Subconsultant Contract") with Defendant Durham on April 1, 2015 for construction inspection services in connection with the Project.

The Prime Contract provides that Parsons "binds its successors and assignees to all the terms and conditions of this Contract." Dkt. 68-2 at PARSONS_TRANS000006. Similarly, the Subconsultant Contract provides that it incorporates the Prime Contract and that Durham:

> will be bound by the Prime Contract terms and conditions insofar as they relate in any way, directly or indirectly, … to the Services covered by this Agreement. [Durham] agrees to be bound to [Parsons] in the same manner and extent that [Parsons] is bound to [INDOT] under the Prime Contract, to the extent such obligations of [Parsons to INDOT] relate to the Services outlined in Attachment A (Scope of Services). In the event of conflict between a provision of the Prime Contract and this Agreement, the term of the Prime Contract will prevail.

Dkt. 68-3 at 8.

The Prime Contract requires Parsons (and, by virtue of the Subconsultant Contract, Durham) to "understand and utilize all relevant INDOT standards including the Design Manual, where applicable, and other appropriate materials and shall perform all Services in accordance with the standards of care, skill and diligence required in Appendix 'A' or, if not set forth therein, ordinarily exercised by competent professionals doing work of a similar nature." Dkt. 68-2 at PARSONS_TRANS000019. Appendix A to the Prime Contract sets forth the services to be performed by Parsons, and, in turn, by

Durham, per the Subconsultant Contract. Appendix A provides that Parsons and its subconsultants will provide project engineers/project supervisors ("PE/S") and any necessary support staff. *Id.* at PARSONS_TRANS000022.

The "Description of Services" specified in Appendix A to the Prime Contract requires Parsons and its subconsultants to "[p]erform all appropriate inspection duties, functions, and tasks that pertain to [Parsons'] PE/S and staff as directed by INDOT's Area Engineer or PE/S and as described in the 'General Instructions to Field Employees' (including revisions thereto) construction memorandums as published by INDOT, and as otherwise directed by the INDOT personnel." *Id.* Appendix A further provides that Parsons and its subcontractors shall, *inter alia*, "[f]urnish all construction field testing equipment necessary to sample and test materials in accordance with INDOT procedures"; "[r]eceive and act upon shop drawings and falsework drawings"; "[c]onduct on-site inspections of the work in progress as a basis for determining that the work is proceeding in accordance with the contract documents." *Id.* at PARSONS_TRANS000023.

Attachment E to the Subconsultant Contract contains "Special Provisions" binding Durham, including the following:

> SP 6. Health and Safety—Subconsultant [Durham] and each of Subconsultant's lower-tier subcontractors shall establish and implement a safety health and environment program that complies with all applicable provisions of federal, state, and municipal health and safety, health and environment laws, including, but not limited to, appropriate record keeping and training requirements, for the purpose of preventing incidents and injuries to persons or property on, about, or adjacent to the Work Site. Subconsultant shall erect and properly maintain as required by the conditions

and progress of the Services, necessary safeguards for the protection of workers, the public and the environment.

Subconsultant shall abide by and enforce all posted Consultant's and Client's fire, safety, health and environment rules and regulations that are in force at the work site. Subconsultant shall fully acquaint itself with these rules and regulations before starting the Services. Consultant may require Subconsultant to remove from the work site any of Subconsultant's employees or lower-tier subcontractors for committing a serious fire, safety, health, and environment violation.

…

SP 6.1 Safety Representative—Subconsultant shall designate a qualified and experience safety representative at the Work Site whose duties and responsibilities shall be the prevention of incidents and the implementing, maintaining and supervising of safety, health and environment precautions and safety, health and environment programs that may be impacted by the Subconsultant's services and/or actions. The Consultant reserves the right to approve or reject this person based on performance or lack of qualifications.

Dkt. 68-3 at 18.

Other separate documents, including INDOT Standard Specifications for 2014 and the INDOT Contract Information Book ("CIB"), were incorporated by reference in the Prime Contract and applied to the construction activities forming the basis of this litigation. Parsons and, in turn, Durham were contractually obligated to enforce and monitor the plans and procedures set forth in those incorporated documents. As relevant here, paragraph 103.07 of the Standard Specification provides as follows:

> **Accident Prevention and Safety** In the performance of the contract work, the Contractor shall comply with all applicable federal, State, and local laws governing safety, health, and sanitation. The Contractor shall provide all safeguards, safety devices, and protective equipment. The Contractor shall take all reasonably necessary actions to protect the life and health of employees on the project site and the safety of the public ….

4

Dkt. 70-5 at 24.  The Standard Specifications also required there to be "sufficient watchers" furnished and on duty during all widening and patching operations who were assigned to monitor and prevent traffic backups similar to the one that existed at the time of the collision forming the basis of this litigation.  Duncan Dep. at 52–54.

The CIB provides in relevant part that a "Traffic Control Plan" for the Project was to be included in the contract documents addressing "the maintenance and protection of traffic within the construction zone, detour route locations, local road closures, construction operation phasing, access for construction equipment, and construction signage."  Dkt. 70-6 at 8.  This "Traffic Control Plan" was among the plans and procedures Durham was responsible for enforcing and monitoring on the Project.

**The Underlying Lawsuit**

On December 19, 2016, Paul Buck filed a lawsuit in Tippecanoe Superior Court ("the *Buck* Lawsuit") following the tragic deaths of his wife, Jill Buck, and two of his sons, B.B. and A.B., as a result of a multiple-vehicle accident that occurred on July 23, 2015.  In that lawsuit, Durham is named as a defendant along with Parsons and several other entities alleged to have entered into consulting contracts, subconsulting contracts, or other contractual agreements to perform supervisory, inspection, and/or engineering services in connection with the Added Travel Lanes construction project.

The *Buck* Lawsuit alleges that on July 23, 2015, Jill Buck was driving southbound on I-65 with her sons, B.B. and A.B., as passengers when she brought her vehicle to a stop behind traffic near mile marker 177.4 in West Lafayette, Tippecanoe County, Indiana.  A tractor-trailer approaching the traffic backup was unable to stop in time and

struck the Bucks' vehicle from behind, pushing it into a third party's vehicle. The tractor-trailer caught fire and the fire spread to the Bucks' vehicle. The *Buck* Lawsuit alleges that Jill Buck, B.B., and A.B. died as a result of the impact with the tractor-trailer and the subsequent fire.

Durham is named in Count VI of the *Buck* Lawsuit, which is asserted against a group of fourteen "Consulting/Subconsulting Defendants," all of whom are alleged to have entered into contracts to perform services in connection with the I-65 project and owed a duty of care to those traveling on public roads, including Jill Buck, A.B., and B.B., "to exercise reasonable care in the selection, supervision, inspection, retention, and oversight of those persons or entities which [they] selected to repair, maintain, construct and/or reconstruct streets, highways and roadways in the State of Indiana." Dkt. 68-5 (Third Amended Complaint in *Buck* Lawsuit) ¶ 109. The *Buck* Lawsuit further alleges that those defendants, including Durham, "owed a duty to the traveling public to conduct the planning, design, maintenance, construction, reconstruction and repair activities in a safe and reasonable manner and to control the flow of traffic in and around the construction zones in a safe and reasonable manner." *Id.*

The *Buck* Lawsuit alleges that Durham and the other Consulting/Subconsulting Defendants "carelessly and negligently breached the duties [they] owed to the traveling public" by having, among other things, negligently:

    a. … selected, supervised, inspected, retained and oversaw its consultants, subconsultants and subcontractors …;

6

  b. … failed to keep and maintain the construction zone and the alterations to Interstate 65 in a reasonable safe condition that did not create or pose a danger to drivers and members of the traveling public …;

  c. … failed to keep and maintain proper lines of sight and appropriate visibility for drivers traveling through the construction zone …;

  d. … failed to follow the requirements and specifications for the use and removal of construction warning and informational signs in a reasonably safe manner so that the construction activities did not create or pose a danger to drivers and members of the public and … failed to follow the requirements and specifications regarding monitoring and controlling the flow of traffic in and around the construction zone …;

  e. … failed to design, create, implement modify, adjust and develop the requirements and specifications for the use and removal of construction warning and informational signs as well as the movement and maintenance of traffic in a reasonably safe manner so that the construction activities did not create or pose a danger to drivers and members of the traveling public ….

*Id.* ¶ 110.

**The Sentinel Policy**

  At the time of the accident, Durham had a general commercial liability policy of insurance issued by Sentinel, policy number 36 SBA AI2450 ("the Sentinel Policy"), that was in full force and effect with a limit of $1,000,000 per occurrence and $2,000,000 in the aggregate, where applicable. The Business Liability Coverage Form (Form SS 00 08 04 05) provides that, subject to the policy's terms, conditions, definitions and exclusions, Sentinel will pay those sums that Durham becomes obligated to pay as damages because of "bodily injury" to which the insurance applies[1] and that Sentinel will "have the right

---

[1] The Sentinel Policy also applies to "property damage" and "personal advertising injury," but neither of these types of damage is alleged in the *Buck* Lawsuit.

7

and duty to defend the insured against any 'suit' seeking those damages." Dkt. 68-4 at 85. The insurance policy applies to "bodily injury" cause by an "occurrence" in the "coverage territory" during the policy period. *Id.* The Sentinel Policy defines "bodily injury" as physical injury, sickness, or disease sustained by a person, including "if arising out of the above, mental anguish or death at any time." *Id.* at 104. The Sentinel Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 106.

The coverage provided under the Business Liability Coverage Form is limited by the following endorsement:

### BUSINESS LIABILITY COVERAGE FORM

The following is added to Paragraph **1., Applicable to Business Liability Coverage** (Section **B.** – EXCLUSIONS):

1. This insurance does not apply to "bodily injury" … arising out of the rendering of or the failure to render any professional services by:

   a. Any insured; or

   b. Any engineering, architectural or surveying firm that is performing work on your behalf in such capacity.

2. Professional services includes but is not limited to:

   a. The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, recommendations, reports, surveys, field orders, change orders, designs or drawings and specifications; and

   b. Supervisory, inspection, quality control, architectural or engineering activities.

3. This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which

caused the "bodily injury" … involved the rendering of or failure to render any professional services by that insured.

*Id.* at 171.

The Sentinel Policy also provides umbrella liability coverage with a limit of liability of $10,000,000 per occurrence and in the aggregate, where applicable. The "Umbrella Liability Provisions" provide that, subject to the policy's terms, definitions and exclusions, Sentinel will pay those sums that Durham becomes obligated to pay as damages in excess of the underlying insurance because of "bodily injury" which occurs during the policy period. The Umbrella Liability Provisions are modified by endorsement as follows:

### UMBRELLA LIABILITY PROVISIONS

1. The following exclusion is added to B., Exclusions (SECTION I – COVERAGES):

   This policy does not apply to "bodily injury" … arising out of the rendering of or the failure to render any professional services by:

   a. Any "insured"; or

   b. Any engineering, architectural or surveying firm that is performing work on your behalf in such capacity.

2. Professional services includes but is not limited to:

   a. The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, recommendations, reports, surveys, field orders, change orders, designs or drawings and specifications; and

   b. Supervisory, inspection, quality control, architectural or engineering activities.

3. This exclusion applies even if the claims against any "insured" allege negligence or other wrongdoing in the supervision, hiring, employment,

> training or monitoring of others by that "insured", if the "occurrence" which caused the "bodily injury" … involved the rendering of or failure to render any professional services by that insured.

*Id.* at 172.

**The Instant Litigation**

On January 1, 2018, Sentinel filed a Complaint for Declaratory Judgment in this action seeking a declaration that it has no duty to defend or indemnify Durham in the underlying lawsuit. Sentinel moved for summary judgment on December 5, 2018, arguing that the *Buck* Lawsuit alleges negligent performance of professional services, which is not an "occurrence" as defined by the Sentinel Policy, and, alternatively, that the Professional Services Exclusion in the Sentinel Policy unambiguously bars coverage for Durham's claim. That motion is now fully briefed and ripe for ruling.

## Legal Analysis

**I.  Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II. Interpretation of Insurance Contracts Under Indiana Law

There is no dispute that Indiana law governs this case. In an insurance policy dispute under Indiana law, "the insured has the burden of proving that the coverage applies, and the insurer, if relying on an exclusion to deny coverage, has the burden of demonstrating that the exclusion is applicable." *Bowman, Heintz, Boscia & Vician, P.C. v. Valiant Ins. Co.*, 35 F. Supp. 3d 1015, 1023 (N.D. Ind 2014) (quotation marks and citation omitted). The interpretation of an insurance policy involves a matter of law. *Westfield Companies v. Knapp*, 804 N.E.2d 1270, 1273–74 (Ind. Ct. App. 2004). Insurance contract provisions are subject to the same rules of construction as other contracts. Thus, courts must construe insurance policies as a whole, rather than considering individual words, phrases or paragraphs. *Id.* at 1274. If the contract language is clear and unambiguous, it should be given its plain and ordinary meaning. *Newman Mfg., Inc. v. Transcon. Ins. Co.*, 871 N.E.2d 396, 401 (Ind. Ct. App. 2007). Additionally, "[i]nsurance companies are free to limit their liability, so long as they do so in a manner consistent with public policy as reflected by case or statutory law." *Gheae v. Founders Ins. Co.*, 854 N.E.2d 419, 423 (Ind. Ct. App. 2006). Thus, "[a]n insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability." *Amerisure, Inc. v. Wurster Const. Co., Inc.*, 818 N.E.2d 998, 1002 (Ind. Ct. App. 2004).

Under Indiana law, an insurer's duty to defend is broader than its duty to indemnify. *Indiana Farmers Mut. Ins. Co. v. Ellison*, 679 N.E.2d 1378, 1381–82 (Ind. Ct. App. 1997), *trans. denied*. In order to determine whether an insurer has a duty to

defend, Indiana courts look to the allegations contained within the complaint as well as to those facts known or ascertainable by the insurer after a reasonable investigation. *Jim Barna Log Sys. Midwest, Inc. v. General Cas. Ins. Co. of Wisconsin*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003). The complaint's allegations give rise to a duty to defend whenever, if proved true, coverage would attach. *See Federal Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997). However, "[w]hen the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend." *Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.*, 650 N.E.2d 1205, 1208 (Ind. Ct. App. 1995).

## III. Discussion

Sentinel argues that no coverage or duty to defend exists pertaining to the claims alleged against Durham in the *Buck* Lawsuit because those claims arise from alleged professional errors or omissions, not an "occurrence" as defined by the Sentinel Policy, or, alternatively, even if arising from an "occurrence," such claims are subject to the Professional Services Exclusion in the Sentinel Policy, which expressly applies to injury arising out of the rendering of or failure to render any professional services, including "[s]upervisory, inspection, quality control … or engineering activities." Dkt. 68-4 at 171–72. Mr. Buck rejoins that, pursuant to the non-delegable duty of safety imposed on Durham under the Subconsultant Contract, Durham may be held vicariously liable for the negligence of subcontractors not based upon the performance of professional engineering

12

services, and thus, Sentinel's motion for summary judgment must be denied. We address these arguments in turn below.

### A. An "Occurrence"

The Sentinel Policy insures against liability for "bodily injury" caused by an "occurrence." As discussed above, "occurrence" is defined under the Sentinel Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." While "accident" is not further defined in the Sentinel Policy, Indiana courts define the term as used in insurance contracts as "an unexpected happening without an intention or design." *Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1283 (Ind. 2006). "To determine if the duty to defend is triggered, the key inquiry is whether any of the allegations contained in the complaint allege accidental conduct." *U.S. Liability Ins. Co. v. Parchman*, No. 1:11-cv-01244-TWP-DML, 2013 WL 2600406, at *4 (S.D. Ind. June 11, 2013) (citing *Jim Barna*, 791 N.E.2d at 826). Sentinel claims that it is entitled to summary judgment in this declaratory judgment action because the deaths of Mrs. Buck and her two sons did not result from an "occurrence" as defined in these policies.

Neither party cites any prior case in which an Indiana court has held that a failure to meet a contractual standard of care constituted an "occurrence" for purposes of coverage under a general liability policy. Rather, "[c]laims based on negligent performance of commercial or professional services are ordinarily insured under 'errors and omissions' or malpractice policies." *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1002 (Ind. 2009); *see also Westfield Ins. Co. v. Orthopedic & Sports Med. Ctr. of N.*

*Ind., Inc.*, 247 F. Supp. 3d 958, 972 (N.D. Ind. 2017) ("The failure to meet a standard of care under a contractually assumed duty is not an 'accident.'"); *Allstate Ins. Co. v. Preferred Fin. Sols., Inc.*, 8 F. Supp. 3d 1039, 1050 (S.D. Ind. 2014) ("[A] business's failure to perform its services in the manner that it had promised is an 'error or omission' but not by any stretch an 'accident.'").

Here, the *Buck* Lawsuit alleges that Durham owed a duty to exercise reasonable care in the "selection, supervision, inspection, retention, and oversight" of subcontractors and "to conduct the planning, design, maintenance, construction, reconstruction and repair activities in a safe and reasonable manner." Dkt. 68-5 ¶ 109. Durham is alleged to have breached those duties to the public by negligently supervising subcontractors, failing to maintain proper lines of sight and appropriate visibility for drivers traveling through the construction zone, failing to follow requirements for use and removal of warning signs, and failing to appropriately monitor and control the flow of traffic in reasonably safe manner. *Id.* ¶ 110. These allegations all involve Durham's failure to adequately perform various "construction inspection services," which are central to Durham's commitments in the Subconsultant Contract. Accordingly, the *Buck* Lawsuit alleges merely Durham's "simple failure to do its job as promised, a risk that's involved in every business relationship, but which is not an accident covered under a general liability insurance policy." *Allstate Ins. Co.*, 8 F. Supp. 3d at 1050–51.

In his response, Mr. Buck relies heavily on the fact that Durham assumed a non-delegable contractual duty of safety that could subject it to vicarious liability for the acts and conduct of non-professional subcontractors under common law negligence principles.

14

The *Buck* Lawsuit's allegations against Durham are not so broad, however. A review of those allegations reveals that they are limited to Durham's alleged failures to adequately perform construction inspection services—services which it is in the business of performing—in the manner it had contracted to perform them. It is well-established under Indiana law that "the term 'occurrence' does not contemplate professional error, poor business performance, or breach of contract." *Indiana Farmers Mut. Ins. Co. v. North Vernon Drop Forge, Inc.*, 917 N.E.2d 1258, 1272 (Ind. Ct. App. 2009), *trans. denied* (citing *Tri-Etch*, 909 N.E.2d at 1003).

### B. Professional Services Exclusion

Even if the claims at issue in the *Buck* Lawsuit had arisen from an "occurrence," we hold, for the reasons detailed below, that the Professional Services Exclusion in the Sentinel Policy applies here to bar coverage. As noted above, the Sentinel Policy excludes from coverage liability for "'bodily injury' … arising out of the rendering of or the failure to render any professional services," including "[t]he preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, recommendations, reports, surveys, field orders, change orders, designs, or drawings and specifications" as well as "[s]upervisory, inspection, quality control, architectural or engineering activities." Dkt. 68-4 at 171, 172. This exclusion specifically provides that coverage is excluded "even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others" so long as "the 'occurrence' which caused the 'bodily injury' … involved the rendering of or failure to render any professional services by that insured." *Id.*

15

In assessing the scope of the professional services exclusion in the Sentinel Policy, we look to "the nature of the allegedly wrongful actions rather than [to] the identity of the claimant or the legal theories the claimant chooses to articulate." *Erie Ins. Group v. Alliance Envtl., Inc.*, 921 F. Supp. 537, 542 (S.D. Ind. 1996). While "[a] professional services exclusion in a general business liability policy cannot be read so broadly as to exclude liability for *any* act at all taken in the course of providing professional services … a professional services exclusion also should not be read so narrowly as to transform a general business liability policy into a professional errors and omissions policy." *Id.* at 542–43 (emphasis added). "[T]he focus must be on whether the claimant is seeking to impose liability for acts which were taken in the course of providing professional services and which drew upon (or at least should have drawn upon) the professional's training, skill, experience, or knowledge." *Id.* at 543.

Mr. Buck contends that, under the Subconsultant Contract, Durham owed a non-delegable duty of reasonable care and safety to the public, potentially exposing it to vicarious liability for negligent acts by non-professional subcontractors that would fall outside the scope of Durham's professional services and thus would not be barred by the Professional Services Exclusion. However, assuming Durham had such a duty, it is not implicated by the allegations in the *Buck* Lawsuit. There is no allegation that Durham or any third party caused bodily injury by their ordinary negligence in taking some action falling outside the provision of professional services. Rather, all the actions alleged to have caused the bodily injury in this case were made in the course of providing professional services on the construction project and came within the scope of Durham's

professional engineering services. In assessing potential safety dangers, ensuring proper lines of sight and appropriate visibility, and ensuring adequate monitoring and control of the flow of traffic, Durham would have, or at least should have, been drawing on its professional experience, skill, judgment and knowledge. Likewise, recognizing improper implementation of safety precautions or failures to properly control traffic or ensure adequate lines of sight and visibility involve at least some specialized knowledge and expertise. Accordingly, we hold that Durham's liability, if any, would come within the scope of the Professional Services Exclusion and Sentinel therefore has no duty to defend Durham or to provide coverage for the claims alleged against Durham in the underlying litigation.

## IV. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall be issued accordingly.

IT IS SO ORDERED:

Date: _____1/6/2020_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Timothy Francis Devereux
WAGNER REESE, LLP
tdevereux@WagnerReese.com

Dustin F. Fregiato
LADENDORF LAW
dustin@ladendorf.com

Logan C. Hughes
REMINGER CO. LPA (Indianapolis)
lhughes@reminger.com

Houston Hum
REMINGER CO. LPA (Indianapolis)
hhum@reminger.com

Mark C. Ladendorf
LADENDORF LAW
mark@ladendorf.com

Charles J. Maiers
DUE DOYLE FANNING & ALDERFER LLP
cmaiers@duedoyle.com

Joshua P. Mayer
SHIPMAN & GOODWIN, LLP
jmayer@goodwin.com

James P. Ruggeri
SHIPMAN & GOODWIN, LLP
jruggeri@goodwin.com